654 F.2d 108
 210 U.S.App.D.C. 1
 The GOVERNORS OF the UNITED STATES POSTAL SERVICE, Petitioner,
v.
The UNITED STATES POSTAL RATE COMMISSION, Respondent,
Southern Pacific Communications Company and GTE Telenet
Communications Corporation, Intervenors.
 No. 80-1971.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 21, 1981.
Decided May 29, 1981.
 
 Benjamin W. Heineman, Jr., Washington, D. C., with whom Joseph A. Califano, Jr., Louis A. Cox, Gen. Counsel and Harold J. Hughes, Associate Gen. Counsel, U. S. Postal Service, Washington, D. C., were on the brief, for petitioners.
 David F. Stover, Gen. Counsel, U. S. Postal Rate Commission with whom Stephen A. Gold, Deputy Gen. Counsel and Ira M. Pesserilo, Atty., U. S. Postal Rate Commission, Washington, D. C., were on the brief, for respondent.
 John V. Kenny, Washington, D. C., was on the brief, for intervenor, Southern Pacific Communications Co.
 Donald E. Ward and Philip M. Walker, Washington, D. C., were on the brief, for intervenor, GTE Telenet Communications Corp.
 Before WRIGHT, ROBB and EDWARDS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROBB.
 Dissenting opinion filed by Circuit Judge J. SKELLY WRIGHT.
 ROBB, Circuit Judge:
 
 
 1
 In this case we must resolve a dispute between two governmental agencies, the United States Postal Service and the Postal Rate Commission. Both these agencies have responsibilities under the Postal Reorganization Act, Pub.L. 91-375, 84 Stat. 719 (1970), codified at 39 U.S.C. § 101 et seq. (1976). Pursuant to that statute the Postal Service submitted to the Rate Commission a mail classification proposal to add to the Domestic Mail Classification Schedule a new "electronic mail" service known as "E-COM", an acronym for Electronic Computer Originated Mail. After the hearing required by sections 3623 and 3624 of the Act, 39 U.S.C. §§ 3623, 3624, the Commission transmitted to the Governors a decision recommending that the E-COM service be designated as "experimental" with a fixed terminal date. The Board of Governors contends on this appeal that the Commission has no authority to make such a recommendation. We hold that the Board is right.
 
 
 2
 By passing the Postal Reorganization Act in 1970 Congress abolished the old Post Office Department and created in its place the United States Postal Service and the Postal Rate Commission. One of the principal reasons for this sweeping revision of the postal establishment was inadequate or diffused management authority in the Post Office.
 
 
 3
 In 1970 postal management was beset with the problem of inadequate authority to perform the task of delivering the mail. For example, the practices and procedures of local post offices were often dictated by antiquated statutes and rules. Report of the President's Commission on Postal Organization, Towards Postal Excellence 18, 34 (1968) (President's Commission Report). Postmasters and other postal employees were often selected because of political loyalty rather than merit, id. at 40-41. The decision to build a postal facility was made by Congress, id. at 145. See H.R.Rep.No.91-1104, 91st Cong. 2d Sess. 5 (1970), U.S.Code Cong. & Admin.News 1970, p. 3649. Management decisions were shared by eight different governmental agencies, dividing up finance, transportation, and other functions. See Note, The Postal Reorganization Act: A Case Study of Regulated Industry Reform, 58 Va.L.Rev. 1030, 1032 (1972). In short, postal managers were given broad duties but their powers were insufficient to enable them to fulfill those duties. See President's Commission Report, supra at 33-34, 43-46; H.R.Rep.No.91-1104, supra, at 5.
 
 
 4
 The Postal Reorganization Act of 1970, an outgrowth of the President's Commission Report, was designed to free postal management from entangling red tape and to concentrate management authority so as to provide an efficient and economical postal system. See H.R.Rep.No.91-1104, supra, at 5-6; S.Rep. 91-912, 91st Cong., 2d Sess. 2, 4-5 (1970). To accomplish these purposes the Postal Service was established and charged with the duty to "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C. § 403(a). Among other powers the Postal Service was given the power "to adopt, amend, and repeal such rules and regulations as it deems necessary to accomplish the objectives of this title"; to enter into and perform contracts; to acquire personal or real property; to construct, operate, lease, and maintain buildings and facilities; and to determine the need for post offices, and postal and training facilities. 39 U.S.C. § 401(3), (5), (6); § 404(a)(3).
 
 
 5
 The Postal Service is governed by an eleven-member Board of Governors, nine of whom are appointed by the President. 39 U.S.C. § 202(a). One of the two remaining members, the Postmaster General, is appointed by the nine governors. 39 U.S.C. § 202(c). The eleventh member, the Deputy Postmaster General, is appointed by the nine governors and the Postmaster General. 39 U.S.C. § 202(d). The Governors oversee the Postal Service as it plans, develops, promotes, and provides mail service throughout the United States. 39 U.S.C. §§ 202(d), 403(a).
 
 
 6
 The Postal Rate Commission was created as an independent establishment and charged with the duty of making recommendations to the Governors of the Postal Service with respect to rate, fee and classification matters. 39 U.S.C. §§ 3601, 3622, 3623 and 3624.
 
 
 7
 The Commission is composed of five commissioners appointed by the President. 39 U.S.C. § 3601. It is empowered, upon request from the Postal Service, to submit to the Service a recommended decision on changes in rates or fees. 39 U.S.C. § 3622. Upon such a request or on its own initiative, the Commission may submit a recommended decision on changes in the mail classification schedule. 39 U.S.C. § 3623(b).
 
 
 8
 In considering Postal Service requests for recommended decisions on rates, fees, and classifications under sections 3622 or 3623 the Commission is required to accord to the Postal Service, users of the mails, and an officer of the Commission representing the public, an opportunity for a hearing under 5 U.S.C. §§ 556-57. 39 U.S.C. § 3624(a), (b). The recommended decision which the Commission submits must address specifically the statutory criteria established under 39 U.S.C. § 3622 or § 3623. 39 U.S.C. § 3624(d).
 
 
 9
 Upon receiving a recommended decision of the Commission the Governors have several options. They may approve the Commission's recommendation and order it to take effect, 39 U.S.C. § 3625(b), or reject the decision and return it to the Commission for reconsideration. 39 U.S.C. § 3625(d). As an alternative the Governors may, under protest, allow the recommended decision to take effect and either seek judicial review under 39 U.S.C. § 3628 or return the decision to the Commission for reconsideration and a further recommended decision. 39 U.S.C. § 3625(c). If the Governors return the decision for reconsideration they may seek judicial review of the Commission's further recommended decision. 39 U.S.C. § 3625(c) & (d).[1]
 
 
 10
 At issue in this case is the scope of the Commission's authority in recommending decisions to the Governors pursuant to 39 U.S.C. § 3624. As we have said, the controversy arises out of a postal service proposal to enter the field of electronic mail and the Commission's recommended decision in response to that proposal.
 
 
 11
 As its name implies, Electronic Computer Originated Mail, or E-COM, is essentially a bulk mail service, whereby large quantities of computer-generated letters can be sent out. The messages need not be identical, because the computer can handle the insertions of differing addresses, amounts due (e. g., on bills) or other items from message to message. Upon reception at a specially equipped post office the electronic impulses representing the messages are converted by a printer into hard copy, placed in envelopes, and delivered as letters in the first class mail.
 
 
 12
 On September 8, 1978 the Postal Service requested the Commission to make and submit to the Governors a recommended decision on a change in the classification schedule to establish electronic computer originated mail as a new subclass of first class mail, known as E-COM. The Postal Service proposal contemplated a sole-source contract between the Postal Service and Western Union Telegraph Company. Under this contract the Service would accept E-COM messages at the site of Western Union's computer in Middletown, Virginia, and the messages would then be transmitted to one of twenty-five specially equipped post offices, known as Serving Post Offices or SPO's where they would be printed, inserted in envelopes and delivered as first class mail.
 
 
 13
 A number of intervenors appeared in the case, including the United States Department of Justice, the Federal Communications Commission, and the National Telecommunications and Information Administration of the Commerce Department, as well as a number of telecommunications firms. The Officer of the Commission, representing the interests of the general public pursuant to 39 U.S.C. § 3624(a), proposed an alternative system which he considered superior to the Service's plan. His plan was to distribute the data-processing equipment among the twenty-five specially equipped post offices, rather than limit it to Western Union's computer site. He believed his system was superior to the Service's plan because it contemplated free entry into the telecommunications phase by any qualified carrier and permitted the use of more modern and less expensive computers and lower rates.
 
 
 14
 After extensive hearings on the record the Commission recommended the Officer's proposal in preference to the Service's plan. The Commission also concluded that whatever system was chosen E-COM should be recommended as an "experiment", to provide for a resolution of questions which the Commission thought were left unanswered on the record. The Commission said that "the volumes to be expected for electronic mail are still the subject of speculation", and that it was also necessary to develop "a means for assuring fair and equal access to the postal service delivery system by all carriers willing and able to participate." Finally, the Commission agreed with its officer that "market testing" of the rapidly developing technology was necessary, together with further exploration of "technical issues regarding privacy and mail security". (J.A. 600-602) The Commission thought that
 
 
 15
 (e)xperimental approval ... is consistent with the regulatory practice approved in such cases as United Telegraph Workers v. FCC, 436 F.2d 920 (D.C.Cir.1970) and American Tel. & Tel. Co., et al. (Dataphone), 50 F.C.C.2d 501 (1974). In our own case, we think that our general authority to "take any ... action ... necessary and proper" to the execution of our functions under chapter 36 (§ 3603)[2] amply authorizes the recommendation of the electronic mail program as an experimental one of limited duration.
 
 
 16
 (J.A. 605) (Footnote supplied) Accordingly the Commission recommended that the classification schedule for first class mail be amended to include the following:
 
 
 17
 Electronic Computer Originated Mail (E-COM) is an experimental service which will commence at such time as the necessary facilities are available and shall terminate on October 1, 1983, unless before that date the Governors of the Postal Service shall have acted, following a recommended decision under 39 U.S.C. § 3624, to (i) extend the experimental period for a further definite time, or (ii) institute E-COM as a permanent service offering.
 
 
 18
 (J.A. 617)
 
 
 19
 On February 22, 1980 the Governors of the Postal Service rejected the Commission's recommended decision. Although the Governors stated that they concurred "in the basic structure" of the recommended decision, they objected to the Commission's designation of E-COM as an experimental service. (J.A. 714) The Governors explainedFixing a terminal date for the evaluation of the viability of such a new, important, and expensive service may well affect the short-term effort and seriously impair the chances of ultimate success. Further, there appears to be no statutory authority for this procedure. Although the law clearly permits the PRC or the Postal Service to initiate changes in the DMCS (Domestic Mail Classification Schedule), effective dates for the implementation of rate and classification decisions are explicitly the responsibility of the Board of Governors. The law is silent on ending dates.
 
 
 20
 From a practical point of view, the investment risks for the Postal Service, communications carriers, and customers, and the time needed to obtain satisfactory operation of the system, promote business, and obtain conclusive favorable results militate against a specified time limit for E-COM.
 
 
 21
 (J.A. 716) The Governors directed the Postal Service to resubmit the matter to the Commission, requesting modifications.
 
 
 22
 On April 8, 1980 the Postal Rate Commission issued its reconsidered recommended decision. The Commission adhered to its position that E-COM should be designated as an experimental service. Conceding that the statute contains no "specific provision ... permitting the approval of proposals on an 'experimental' basis of limited duration" the Commission argued that "situations have arisen in the work of other regulatory agencies none of them endowed by statute with explicit power to authorize time-limited experiments in which the need to gain more information regarding a potentially beneficial new service has led to the issuing of an order similar to ours. The courts have approved this practice. See, e. g., Delta Air Lines, Inc. v. CAB, 455 F.2d 1340 (D.C.Cir.1971); American Airlines, Inc. v. CAB, 359 F.2d 624 (D.C.Cir.1966); Network Project v. FCC, 511 F.2d 786 (D.C.Cir.1975)." (J.A. 731-32) The Commission stated "(w)e are sympathetic to the potential problems that an unexplained 'experimental' designation could present for management and marketing personnel who must promote the new service and for customers who must commit some of their own resources to use it." (J.A. 733) Nevertheless, the Commission said its "use of the terms 'experiment' and 'experimental' was to insure that an adequate opportunity for later review of the costs and characteristics of the E-COM system will be available, and, at the same time, to assure potential customers, connecting carriers, and the Service itself, that the Service's involvement in electronic mail is not a short-lived phenomenon." (J.A. 733) (Emphasis in original) The Commission extended the experimental period one year, from 1983 to 1984. The two Commissioners who dissented from the first recommended decision continued their dissent.
 
 
 23
 On August 15, 1980 the Governors allowed the Commission's further recommended decision to take effect under protest and petitioned for review of the decision in this court pursuant to 39 U.S.C. §§ 3625(d) and 3628.[3] In announcing their decision to seek review the Governors asserted that the Postal Rate Commission's decision to designate the E-COM system as experimental was "far outside the Commission's statutory authority." (J.A. 775) Continuing, the Governors said:
 
 
 24
 Under the Postal Reorganization Act, the Commission has a very important, but expressly limited, role. Its fundamental responsibilities are in the areas of recommending rates and classifications, although it also performs some advisory and hearings functions under certain other specified conditions. Unlike other administrative agencies, it does not have a broad power to regulate. It is, instead, an agency operating within a statutory framework that envisions explicit roles for two other units, namely the Postal Service and the Governors. See Dissent of Commissioner O'Doherty, Postal Rate Commission, Recommended Decision Upon Reconsideration at 1-2; United Parcel Service v. United States Postal Service, 455 F.Supp. 857, 874 (E.D.Pa.1978), aff'd 604 F.2d 1370 (3d Cir. 1979).
 
 
 25
 (J.A. 781) In Commissioner O'Doherty's dissent, referred to by the Governors he urged them "to repel the majority's continued attempts to arrogate the basic statutory powers of Postal Service management." (J.A. 770-71)
 
 
 26
 Thus we are presented with a question of law: when the Postal Service submitted to the Postal Rate Commission a proposal to enter the electronic mail field, did the Commission have authority under the statute to approve the program as an experiment of limited duration only?[4]
 
 
 27
 Examination of the background and legislative history of the Postal Reorganization Act does much to make plain the answer to our question.
 
 
 28
 As we have noted the origin of the Postal Reorganization Act was in the Report of the President's Commission. This Commission, consisting of ten members, was headed by Frederick R. Kappel, retired chairman of the Board of Directors of the American Telephone & Telegraph Company.[5] The Commission found that
 
 
 29
 (t)he Post Office's principal failure is one of management.... The organization of the Post Office as an ordinary Cabinet department guarantees that the nominal managers of the postal service do not have the authority to run the postal service .... A hodgepodge of postal laws two hundred years in the making constrains managerial judgment and initiative.... A diffusion of management authority at the top distinguishes the Post Office from other enterprises. In appearance many people are responsible for running the Post Office; in fact, no one is.
 
 
 30
 Such fragmentation of authority comes not from a conscious determination that this is the best way to run the Post Office. Most Government administration is properly subject to a series of controls which in the aggregate foster (sic) caution rather than innovation.
 
 
 31
 The continued application of these restrictions precludes responsible business management in the Post Office. The absence of responsible management having normal operating authority is, we believe, the primary cause of the deficiencies noted ....
 
 
 32
 President's Commission Report, 33, 34. (Emphasis in original)
 
 
 33
 The Commission recommended that Congress charter a government-owned corporation to operate the Postal Service and that "(f)ull management responsibility and authority ... be vested in the Board of Directors" of the corporation. "The essential element for the success of the Postal Corporation" said the Commission, "is a Board of Directors with full authority for postal management.... Whatever the structure of the Board, the important requirement is that it be given the authority to run the postal system...." President's Commission Report, 55-56. (Emphasis in original)
 
 
 34
 The Report of the Senate Committee on Post Office and Civil Service on the bill which became the Postal Reorganization Act acknowledged the "helpful" background information furnished by "the views and findings appearing in the four-volume report of the President's Commission on Postal Organization"; and like the Commission the Senate Committee referred to the tangle of postal laws that made it impossible for the Postmaster General to "function in the public interest as a responsible manager". S.Rep.No.91-912, 91st Cong., 2d Sess. 2 (1970). Although differing from the recommendations of the President's Commission in some respects, the Senate Report echoed the Commission by stating (p. 5):
 
 
 35
 The committee recommends that all authority for operations be vested in the Board of Governors of the U.S. Postal Service....
 
 
 36
 The Board of Governors shall have broad authority and shall not, except as specified, be subject to Federal laws dealing with contracts, property, the civil service system, the Budget and Accounting Act of 1921, apportionment of funds, and other laws which in most instances apply to Government agencies and functions. Among other powers, the Board may issue rules governing the Postal Service, provide for the collection and delivery of mail, establish postal rates and mail classification, establish postal facilities and services, investigate postal offenses, sell property, borrow money, hire and direct its employees, and take such other actions as it deems necessary and proper to operate the Postal Service.
 
 
 37
 Turning to the Postal Rate Commission the Committee said:
 
 
 38
 The Rate Commissioners shall be independent of the Board of Governors.... The committee envisions the Commission to be an integral part of the postal service, to be a true partner of the Board of Governors in every aspect of postal operations. If a bureaucratic struggle between the Board and the Commissioners develops, then the whole theory of independent ratemaking judgments will have failed and the Congress will probably be called upon to revise the system. But if the individuals appointed to the Board on the one hand, and the Commission on the other, recognize the constitutional and legal responsibilities of their position and work together to achieve a truly effective postal service, then the independence of the Commission will serve a vitally important function by permitting them to view the overall impact of postal costs with a degree of detachment which the committee considers vitally important to preserve the public interest and public investment in the largest civilian agency of the Federal Government.
 
 
 39
 The committee believes that if the Board of Governors were authorized to control revenues, it would place them in a position of some businesses in the private sector of the economy pricing with one eye er (sic) over their shoulder to the effect of the cost of an upcoming labor-management agreement.
 
 
 40
 S.Rep.91-912, supra, at 13.
 
 
 41
 We think this history demonstrates the intention of Congress to vest in the Board of Governors exclusive authority to manage the Postal Service. As a "partner" of the Board the Postal Rate Commission was assigned the duty and authority to make recommendations with respect to rates and classifications.[6] There is no indication that Congress contemplated that either "partner" would trench on the functions and prerogatives of the other; on the contrary each was to recognize and be guided by its "constitutional and legal responsibilities". Congress did not intend that the Postal Rate Commission regulate the Postal Service; one partner does not regulate another, and authority to assist in ratemaking and classification does not include authority to interfere in management. It follows that a management decision by the Postal Service may not be overruled or modified by the Rate Commission.
 
 
 42
 This analysis of the Postal Reorganization Act of 1970 is confirmed by the action of Congress in 1976. In 1975 the House passed a bill which required the Postal Service to
 
 
 43
 keep the Postal Rate Commission fully and currently informed with respect to the operation of the Postal Service. The Postal Service shall furnish to the Commission information with respect to (1) internal postal service management matters; (2) plans and policies of the Postal Service with respect to proposed changes in the nature of postal service; and (3) evaluations undertaken by or at the direction of the Postal Service with respect to the operation of the Postal Service.
 
 The bill gave the Postal Rate Commission
 
 44
 the authority to initiate reviews and hearings with respect to the activities of the Board of Governors and the Postal Service.
 
 
 45
 H.R. 8603, 94th Cong., 1st Sess. §§ 11 and 12 (1975). Reprinted in Legislative History of the Postal Reorganization Act Amendments of 1976, 33-34 (1976). These provisions were deleted from the bill as it passed the Senate. Legislative History, supra 257, 258. Thus participation by the Rate Commission in management decisions of the Postal Service was decisively disapproved. It is not the function of the Rate Commission to regulate the management of the Postal Service.
 
 
 46
 The decision to propose E-COM service on a permanent basis rather than as an experiment of limited duration was made by the Board of Governors in the exercise of their judgment and discretion as business managers. As practical managers they were aware of the difficulties that would be encountered if the program were begun only as a short-term effort. Thus, in their response to the Commission's first recommended decision they explained (J.A. 716):
 
 
 47
 Fixing a terminal date for the evaluation of the viability of such a new, important, and expensive service may well affect the short-term effort and seriously impair the chances of ultimate success.
 
 
 48
 From a practical point of view, the investment risks for the Postal Service, communications carriers, and customers, and the time needed to obtain satisfactory operation of the system, promote business, and obtain conclusive favorable results militate against a specified time limit for E-COM.
 
 
 49
 This judgment was peculiarly one for management to make, yet by its recommended decision the Postal Rate Commission attempted to overrule it. We hold that by so doing the Rate Commission exceeded its authority and strayed from its ratemaking and classification powers to intrude upon the management functions of the Board of Governors.
 
 
 50
 The Commission's recommended decision also trenches on the authority of the Governors by usurping their exclusive statutory right to determine the date on which a change in the mail classification schedule will occur. Section 3625(f) of the Act provides:
 
 
 51
 The Board shall determine the date on which the new rates, fees, the mail classification schedule, and changes in such schedule under this subchapter shall become effective.
 
 
 52
 39 U.S.C. § 3625(f).
 
 
 53
 The Governors proposed a permanent E-COM classification. The Commission, in response, recommended that E-COM expire on October 1, 1984 unless the Governors acted in the interim to "(i) extend the experimental period for a further definite time, or (ii) institute E-COM as a permanent service offering." (J.A. 617) In short, the Commission has arrogated to itself the power to set a specific termination date for E-COM absent action by the Governors. The recommendation of the Commission violates section 3625(f) because under this provision the Governors alone decide when the mail classification schedule will change. The Commission cannot impose upon the Governors the affirmative responsibility to prevent change in the schedule.
 
 
 54
 Moreover, the Commission's recommended decision also violates section 3622(a) of the Act, which states that only the Postal Service has authority to request a recommended decision on rate changes. 39 U.S.C. § 3622(a). In the E-COM proceeding, the Commission has recommended, without any request from the Service, that the E-COM rate expire on October 1, 1984. As we have held in Dow Jones & Co., Inc. v. United States Postal Service, et al., 656 F.2d 786 (D.C.Cir. 1981), the unilateral initiation of a recommended rate change by the Commission clearly violates section 3622(a) of the Act.
 
 
 55
 The Commission concedes that no statutory provision expressly authorizes its recommendation of an experimental service. (Br. for Commission at 19) It relies solely on 39 U.S.C. § 3603 which directs the Commission to "promulgate rules and regulations and establish procedures, and take any other action they deem necessary and proper to carry out their functions and obligations to the Government of the United States and the people as prescribed under this chapter." The argument of course is based on the premise that one of the "functions and obligations" of the Commission is to make the challenged recommendation. As we have demonstrated by our analysis of the statute and its history, however, the premise is faulty; making such a recommendation is not one of the Commission's functions or obligations.
 
 
 56
 In this court the Commission cites several cases that purportedly stand for the proposition that experimental initiatives are by implication within the general authority of agencies involved in the process of setting rates. Network Project v. FCC, 167 U.S.App.D.C. 220, 511 F.2d 786 (1975); Delta Air Lines, Inc. v. CAB, 147 U.S.App.D.C. 272, 455 F.2d 1340 (1971); United Telegraph Workers, AFL-CIO v. FCC, 141 U.S.App.D.C. 190, 436 F.2d 920 (1970); and American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 359 F.2d 624 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966).
 
 
 57
 The cases cited by the Commission do not support its assertion of authority to initiate experimental programs. The cases are inapposite because they do not involve the implied authority of a regulatory agency to initiate experimental programs or services. Nor do they deal with a statute like the Postal Reorganization Act that sets up a carefully constructed system of checks and balances between governmental agencies.
 
 
 58
 In the Delta Air Lines case we dismissed a petition challenging an experimental tariff filed by Eastern Airlines with the Civil Aeronautics Board. We did not discuss the authority of the Civil Aeronautics Board to initiate a supplemental tariff, for that was not at issue. The Board merely accepted the filing as proposed by Eastern Airlines; it made no proposal itself. In the Network Project case the FCC authorized an experimental service but it based its action on 47 U.S.C. § 303(g) which directed the Commission to "provide for experimental uses of frequencies".
 
 
 59
 Moreover, the Commission's reliance on these cases is misplaced because it lacks the general administrative authority found in agencies such as the FCC and CAB. In United Parcel Service, Inc. v. United States Postal Service, 455 F.Supp. 857 (E.D.Pa.1978), aff'd 604 F.2d 1370 (3d Cir. 1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980), the District Court rejected an analogy between the Postal Rate Commission and other regulatory agencies with broader mandates over private industry. The Court stated:(T)he FCC, the CAB, the ICC, and other comparable regulatory bodies are really different types of agencies from the Postal Rate Commission. Nor do we think that the difference between them can be distilled in one or two specific provisions of the agencies' statutory charters such that the presence or absence of a particular provision is determinative. A reading of the statutes relevant to (these) agencies ... reveals a statutory gestalt according to which the regulatory agency's control over and involvement in the affairs of the regulated industry are much more pervasive and sweeping than are the involvement and control exercised by the Postal Rate Commission.
 
 
 60
 455 F.Supp. at 874. The District Court also noted the limited role the Postal Rate Commission plays in the statutory scheme:
 
 
 61
 The responsibilities of the Postal Rate Commission are strictly confined to relatively passive review of rate, classification, and major service changes, unadorned by the overlay of broad FCC-esque responsibility for industry guidance and of wide discretion in choosing the appropriate manner and means of pursuing its statutory mandate.
 
 
 62
 Id. at 873. Given these limited statutory responsibilities, the Postal Rate Commission may not rely on the general authority of other regulatory agencies as a legal basis for recommending an experimental service. It must be able to point to a specific grant of authority. As the Commission acknowledges, however, no such provision exists.
 
 
 63
 In its brief in this court the Rate Commission argues that its authority to recommend a supplemental classification is supported by the opinion of the Circuit Court of Appeals in the United Parcel Service case. United Parcel Service, Inc. v. U. S. Postal Service, 604 F.2d 1370 (3d Cir. 1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980). We think the Rate Commission can take no comfort from that decision. All that the court held was that the Postal Service had no authority to establish a temporary experimental classification without submitting it to the Postal Rate Commission for a recommended decision. Id. at 1381-82.
 
 
 64
 In conclusion, we hold that the recommended decision of the Postal Rate Commission was in excess of its authority. Because the statute provides that we may not modify the decision but may only affirm it or "order that the entire matter be returned for further consideration", 39 U.S.C. § 3628, it is ordered that the entire matter be returned for further consideration.
 
 
 65
 So ordered.
 
 
 66
 J. SKELLY WRIGHT, Circuit Judge, dissenting:
 
 
 67
 This case requires us to construe the powers of the Postal Rate Commission (PRC or Commission) under the Postal Reorganization Act (the Act).[1] Section 3623 of the Act,[2] and the Commission's powers under it, are of central importance to the Postal Service. Section 3623 makes it the responsibility of the PRC to recommend changes in the mail classification schedule; the Service generally cannot effect classification changes in the absence of a Commission recommendation.[3] Section 3603,[4] which is also in issue, gives the Commission a statutory mandate to take any actions "necessary and proper" to carry out its functions and obligations under Section 3623 and other provisions of the Act.
 
 
 68
 The dispute before us arises from the Commission's response to a detailed proposal, submitted by the Postal Service under Section 3623, to establish a classification for computerized electronic mail.[5] After on-the-record hearings[6] conducted pursuant to a statutory responsibility to protect the public interest in a fair and equitable mail classification schedule[7] the Commission almost entirely rewrote the Postal Service's proposal.[8] Another round of proceedings ensued, following which the Service's Board of Governors (the Governors) agreed to accept all but one of the substantial changes that the PRC had initiated in their initial draft.[9] The Commission's authority to make that single remaining change frames the issue now before this court: Did the PRC exceed its statutory authority and trench on protected powers of management by proposing that the new classification should be designated as "experimental"?
 
 
 69
 Although it like the Governors acknowledges the authority of the Commission to rewrite the Postal Service's classification proposal in every other regard, the majority today rests its opinion on a holding that the Postal Reorganization Act meant to locate "exclusive"[10] management powers in the Board of Governors. Recommendation of an "experimental" classification, it concludes, encroaches on those powers and therefore offends the intent of the statute.
 
 
 70
 With all respect, I find the majority's argument to be entirely unconvincing. The majority fails to provide a convincing rationale for distinguishing a Commission recommendation to designate a mail classification as experimental which supposedly violates the Act from any of the myriad other recommendations that the PRC may concededly initiate. Moreover, it presents an analysis that is based on a reading of only half of the statute and half of the legislative history the half dealing with the Board of Governors. Although it can indeed marshall evidence that the Governors were intended to have broad "management" powers, the majority fails to reckon persuasively with the fact that Congress also created the Postal Rate Commission, whose regulatory and review powers necessarily limit the Governors' "freedom" to manage. The majority opinion notwithstanding, management power in the Postal Service is inevitably circumscribed by the requirement that it may not act without the approval of an outside body.
 
 
 71
 Reading the Postal Reorganization Act in its entirety, I conclude that the Commission's challenged recommendation represented a responsible exercise of its authority to take actions "necessary and proper" to carry out its "functions and obligations" under the Act.
 
 
 72
 * In upholding the Governors' challenge to the Commission's action, the majority focuses almost entirely on portions of the Postal Reorganization Act and its legislative history that describe in broad terms the functions of postal management. This, however, is a misleadingly one-sided context in which to view the issue presented by this case. The Postal Reorganization Act obviously contemplates an influential role for the Postal Rate Commission. As noted, Section 3623 charges the Commission with making recommended decisions on all changes in mail classifications[11]; no classification may generally be altered or initiated in the absence of a PRC recommendation. The Act invites the Commission to recommend classifications on its own initiative.[12] And Section 3603 vests it with authority to "take any * * * action * * * necessary and proper to carry out (its) functions and obligations * * *."[13]
 
 
 73
 It is under Sections 3623 and 3603 that the Commission justifies its action in the present case. And although the majority pays no heed to this factor, interpretations of those provisions by the Postal Rate Commission the agency responsible for administering those sections of the Act are entitled to deference from this court.[14] Our deference should not, of course, be excessive, especially in a case involving conflicting statutory constructions offered by two bodies chartered under the same Act of Congress. But it is important to keep in mind, here as elsewhere, that the statutory entitlements of the Commission should not be minimized prior to analysis.
 
 A.
 
 74
 As I read the legislative history, the leading indicators of congressional intent suggest that the Commission's power to fulfill its "functions and obligations"[15] under Section 3623 should be interpreted broadly. Congress did indeed embrace the aim of strengthening postal management. But in considering the most relevant sections of the Postal Reorganization Act those dealing with the PRC and its responsibilities in classification matters under Section 3623 it expressed its intention for the Commission to play an active and important role. The Senate Post Office and Civil Service Committee reported that it expected the Commission to "exercise its (own) best judgment to insure that all * * * classifications are reasonable and equitable, and to insure that the rights of all mail users are protected * * *."[16] The Commission was to be "a true partner of the Board of Governors,"[17] it said, with special responsibility to protect "the interests of the general public."[18] And the Act itself expressly confers on the PRC the powers "necessary and proper" to fulfill its functions.[19]
 
 
 75
 Congress obviously created the Commission's "public interest" mandate with the expectation that it would be exercised. To guarantee adherence to this trust, Congress provided that the Commission could issue recommendations only after on-the-record public deliberations.[20] Its decisions must be supported by substantial evidence, subject to judicial review.[21] And, once again, it is significant that a Commission recommendation must precede implementing action by the Governors.[22] The postal reorganization bill passed by the House contained a provision that would have afforded the Governors considerable flexibility to override the Commission's public interest determinations and to implement classifications without the Commission's recommendation.[23] But this provision was deliberately removed by the House-Senate conference committee, which substituted the much more restrictive version ultimately enacted into law.[24]
 
 B.
 
 76
 Neither the majority nor the Governors themselves here dispute the breadth of the Commission's mandate to conduct broad-gauged inquiries into the fairness and equitableness of mail classifications. In the classification proceeding underlying this case, the Postal Service had recommended an electronic mailing system that would have utilized only a single private carrier, Western Union.[25] In reviewing this proposal the Commission pronounced itself bound to weigh the national policy supporting competition,[26] and, accordingly, rendered a recommended decision designed to foster competition among private carriers.[27] In this court the Governors have declined to challenge the authority of the Commission to weigh concerns of competitiveness or monopoly or other factors that it may deem relevant to fairness and equitableness.[28] They explicitly contest only the Commission's authority to recommend a temporary classification. Noting that the statute does not expressly confer authority for the Commission to recommend designation of classifications as "temporary" or "experimental," the Governors argue and the majority today agrees that such a recommendation on its face exceeds the Commission's authority under the Postal Reorganization Act.
 
 
 77
 Among the deficiencies of this argument is its failure to account persuasively for the language of Section 3603. As noted, Section 3603 invests the Commission with authority to "take any * * * action (it) deem(s) necessary and proper to carry out (its) functions and obligations to the Government of the United States and the people as prescribed under this chapter."[29] Thus, against the PRC's citation of this section as support for its action, the Governors must contend that the Commission's action was not "necessary and proper" in light of its classification duties under Section 3623.
 
 
 78
 The plausibility of this claim collapses upon examination of the pertinent facts. This case arose when the Postal Service asked the Commission to recommend a classification for a new and untested service of electronic computerized mailing. In presenting its request the Postal Service offered no market research concerning likely demand.[30] In the view of the Commission, it also failed to answer relevant questions about the fairness of an electronic mail classification to all potential users,[31] as well as about the capacity of any particular service classification to provide fair and equal access to all private carriers wishing to participate.[32] Finally, after extensive on-the-record hearings the Commission found that the record left reasons for concern whether the proposals before it adequately protected privacy and mail security.[33]
 
 
 79
 As noted, the Commission can issue a recommended decision to the Governors only on the basis of substantial evidence in the record. Yet at the end of more than a year of proceedings, due largely to the uncertainties attending introduction of an entirely novel service, the PRC still lacked the evidence to conclude that computer mailing, instituted pursuant to any particular recommended classification decision, would satisfy all the criteria of fairness and equitableness that it was bound to consider.[34] At the same time, however, the Commission had determined that introduction of some system of electronic mailing would indeed be beneficial, and that time and experiment alone could answer the outstanding questions about the precise form that a permanent classification for electronic mail ought to take. In short, the situation was one in which "a month of experience will be worth a year of hearings."[35] Under these circumstances, I have no difficulty in concluding that the Commission's recommendation of an experimental classification was "necessary and proper" within the meaning of Section 3603.
 
 C.
 
 80
 The majority disagrees. Focusing less than I on this case's peculiar facts, it attacks the Commission's reliance on other cases in which regulatory agencies have approved tariff or classification terms on short-term or experimental bases.[36] The majority argues that these cases are inapposite because they involve agencies with more extensive regulatory powers than those of the PRC. But the majority's distinction, however narrowly logical, lacks persuasive force, for it fails to cut to the heart of the matter, which resides in questions of functional logic and congressional intent.
 
 
 81
 The Postal Reorganization Act plainly contemplates development by the Postal Service of new and innovative services.[37] The question therefore arises how those services are to be developed within the scheme of the statute. In United Parcel Service, Inc. v. United States Postal Service[38] the Postal Service claimed authority to initiate experimental services without securing approval of rates and classifications by the Postal Rate Commission. This view was decisively rejected. Both the District Court and the Third Circuit held that experimental services cannot be implemented by the Governors until the Commission has approved experimental rates and mail classifications under Sections 3622 and 3623.[39]
 
 
 82
 The courts in United Parcel Service assumed, doubtless correctly, that it is competent for the Postal Service itself to propose experimental rates and classifications for novel postal services; both courts equally assumed the statutory authority of the PRC to act favorably on such requests.[40] The inevitable existence of unanswered questions questions that may often be unanswerable until a new service has been tested in practice must not be allowed to bar the experiments and development contemplated by Section 3661. Yet, once it is granted that the Commission has authority under Section 3623 to recommend an experimental classification requested by the Postal Service, it becomes difficult to deny that the PRC may initiate such recommendations on its own authority.
 
 
 83
 Section 3623 draws no distinction between the capacity of the Commission and that of the Postal Service to initiate recommendations. The statute expressly authorizes the Commission to "submit to the Governors(,) on its own initiative, a recommended decision on changes in the mail classification schedule."[41] Thus, if the PRC can recommend an experimental classification on the proposal of the Postal Service, Section 3623 seems plainly to establish that it possesses equal authority to do so on its own initiative as well.
 
 II
 
 84
 Viewing this case from what I regard as an essentially one-sided analytical perspective, the majority concludes that the Commission's recommendation of an experimental designation for the electronic mail classification intrudes on management prerogatives expressly or impliedly conferred on the Governors alone. The text of the Act, however, fails to support this conclusion.
 
 A.
 
 85
 The reasoning of the majority relies very heavily on a concealed premise: an assumption that the Postal Reorganization Act recognizes a clear and simple set of "management" powers which it confers on the Governors, insulated in all respects from the advisory and regulatory responsibilities of the PRC.[42] But the premise is fallacious almost on its face. As the District Court observed in United Parcel Service, supra, "The very existence and function of the Postal Rate Commission bespeaks a limitation on postal management's freedom."[43] It therefore will not suffice to invoke general language about "management prerogatives." Close textual and functional analyses are needed to define the congressionally intended border between management's and the Commission's spheres of responsibility.
 
 
 86
 In their brief in this court the Governors attempt to build their argument on a textual foundation, citing statutory provisions conferring on them "management" powers. In particular they point to Section 403(a), which provides that the Postal Service shall "plan, develop, promote, and provide adequate and efficient postal services,"[44] and to Section 3661(a), which states: "The Postal Service shall develop and promote adequate and efficient postal services."[45] Yet these sections provide no help in resolving the central, underlying problem the problem of defining the scope of "management" responsibilities in a context where Congress has specifically decided to limit the powers of management by preventing its acting except upon recommendations issued by an independent Postal Rate Commission.
 
 
 87
 Under the circumstances, general language providing for management responsibilities whether in the statute itself or in the legislative history must be assessed in conjunction with obligations imposed by statute on the PRC. And when this approach is adopted, invocation of general provisions is unavailing. First, as the District Court recognized in United Parcel Service :
 
 
 88
 The ordinary rule of statutory construction * * * is that a general duties provision like § 403(a) may not override specific provisions like §§ 3622 and 3623. (Nat'l Ass'n of Greeting Card Publishers v. United States Postal Service, 569 F.2d 570, 597 (D.C.Cir.1976).) Indeed, the Act itself demonstrates that § 403(a) does not operate as a brake on Commission jurisdiction for, as we have noted, the duty imposed by § 403(a) to provide postal services is clearly subject to Commission jurisdiction under §§ 3622 and 3623 * * *. * * *[46]
 
 
 89
 Second, even without resort to general maxims of construction or inferences of statutory purpose, the Postal Reorganization Act provides explicit evidence against the Governors' claim. By the express terms of Section 3621 the management authority of the Governors with respect to classifications is limited "in accordance with the provisions of this chapter"[47] i. e., chapter 36, which creates the Postal Rate Commission and makes it "at the very least * * * a co-participant"[48] with the Governors in the classification process.
 
 B.
 
 90
 Besides invoking general arguments about the authority of management, the majority contends that the Commission's recommendation of a temporary classification offended the specific language of two provisions of the Postal Reorganization Act, Sections 3622(a)[49] and 3625(f).[50] I do not agree.
 
 
 91
 Section 3622(a) lodges in postal management the discretion to initiate proceedings aimed at changing rates; it makes no mention of any power in the Commission to recommend changed rates except in response to proposals offered by the Postal Service. Because the recommended experimental classification and its attendant rates would expire on October 1, 1984, the Governors assert that they would be "forced" to advance a rate proposal at the completion of the experimental period. It can thus be argued that a "temporary" or "experimental" classification would subvert management's statutory discretion to determine when rate changes should be considered.
 
 
 92
 The argument is unconvincing. At a technical level, an experimental classification would not "force" the Postal Service to seek "changes" in the prevailing classifications or rates. The Governors could allow the rates and classifications to lapse. Or, alternatively, they could ask the Commission to recommend, not a "change" in the rates, but a designation of the existing temporary rates as permanent. On a more practical plane, it must simply be accepted that interaction with a regulatory or advisory agency always and inevitably "forces" management to act in ways that it would not act otherwise for example, to file papers on certain dates or to comply with procedures that it might find cumbersome. And here, where Congress saw the need for advisory and regulatory interaction, it does not seem at all clear that Congress intended the language of Section 3622 to preclude "experimental" recommendations when the Commission thinks them "necessary and proper" to protect the public interest.
 
 
 93
 The majority also relies on Section 3625(f). This section gives the Governors authority to determine the date on which rate and classification changes which must be approved through the statutory process requiring PRC participation will become effective.[51] According to the majority, an experimental designation originated by the Commission violates this provision by fixing the date on which a classification will terminate and by forcing the Governors to seek new rates and classifications, to be implemented at the expiration of the old, at times not of their choosing. Two responses can again be offered. Technically, the Governors remain free to fix the date on which new classifications take effect: They must be the ones to institute the "experimental" classification in the first instance and thus to give effect to its termination date. Moreover, the Governors are never forced to take action in a literal sense; if they choose to allow a classification to lapse, they are free to do so. More importantly, however, Section 3625 must be read purposively, as an integral part of the chapter that creates the PRC and prescribes for it a large role in protecting the public interest in equitable classifications. Congress plainly intended all classification changes to be the result of a balanced interaction between the Governors and the Commission[52]; the Commission's role is that of partner of the Governors and guardian of the public interest. In this context, Section 3625 should not and need not be read to prevent the PRC from taking steps necessary and proper to satisfy its responsibilities.
 
 III
 
 94
 In my view, today's decision wrongly deprives the Postal Rate Commission of a power "necessary and proper to carry out (its) functions and obligations"[53] in insuring just and equitable mail classifications.
 
 
 95
 I respectfully dissent.
 
 
 
 [1]
 The Postal Rate Commission is also assigned a role in advising the Governors on changes "in the nature of postal services which will generally affect service on a nationwide" basis. 39 U.S.C. § 3661(b). The Postal Service must request an advisory opinion from the Commission before instituting such changes. 39 U.S.C. § 3661(b). See Buchanan v. United States Postal Service, 508 F.2d 259, 262-64 (5th Cir. 1975)
 A determination by the Postal Service to close or consolidate any post office may be appealed to the Commission by any person served by such office, and may be set aside if arbitrary, capricious, not in accordance with law, or unsupported by substantial evidence. 39 U.S.C. § 404(b)(5). The Commission is empowered to submit recommended decisions and make reports to the Postal Service on such complaints.
 
 
 [2]
 39 U.S.C. § 3603
 The Postal Rate Commission shall promulgate rules and regulations and establish procedures, subject to chapters 5 and 7 of title 5, and take any other action they deem necessary and proper to carry out their functions and obligations to the Government of the United States and the people as prescribed under this chapter. Such rules, regulations, procedures, and actions shall not be subject to any change or supervision by the Postal Service.
 
 
 [3]
 The dissent makes the point that the Governors accepted most of the changes in the Postal Service's E-COM proposal which the Commission recommended, and have complained of only the one aspect of the Commission's redesign of the proposed service. The fact is, of course, that the Governors need not protest every attempt by the Commission to exceed its authority; if the Governors think the result desirable they may accept it
 
 
 [4]
 The dissent says we should defer to the Commission's interpretation of the statute. Of course there is authority for the proposition that the courts will defer to the Commission in interpreting the Act. (See dissent pp. 119-120) However, there is equally binding authority for the proposition that the courts should defer to the Postal Service in interpreting the Act. See Sierra Club v. United States Postal Service, 549 F.2d 1199, 1201 (9th Cir. 1976); Buchanan v. United States Postal Service, 508 F.2d 259, 263 (5th Cir. 1975); Ass'n of American Greeting Card Publishers, Inc. v. Governors of United States Postal Service, 157 U.S.App.D.C. 397, 404, 485 F.2d 768, 775 (1973). The court cannot defer to both and must in any event "decide all relevant questions of law". 5 U.S.C. § 706 (1976)
 
 
 [5]
 The other members were: Dean George P. Baker, Harvard University Graduate School of Business Administration; Vice President David E. Bell, The Ford Foundation; President Fred J. Borch, General Electric Company; David Ginsburg, Partner in Ginsburg and Feldman; Ralph Lazarus, Chairman of the Board of Directors, Federated Department Stores; President George Meany, American Federation of Labor and Congress of Industrial Organizations; J. Irwin Miller, Chairman of the Board of Directors, Cummins Engine Company; W. Beverly Murphy, President of Campbell Soup Company; and Rudolph A. Peterson, President of the Bank of America
 
 
 [6]
 A postal rate is the fee or price the Postal Service charges for its services. United Parcel Service v. United States Postal Service, 455 F.Supp. 857, 863 (E.D.Pa.1978) aff'd 604 F.2d 1370 (3d Cir. 1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980); H.R.Rep.No.91-1104, 91st Cong., 2d Sess. 19 (1970). A mail classification is a grouping of mailing matters according to size, weight, content, etc., for the purpose of assigning a specific rate or method of handling. Nat'l Retired Teachers Ass'n v. United States Postal Service, 430 F.Supp. 141, 146-47 (D.D.C.1977), aff'd, 193 U.S.App.D.C. 206, 593 F.2d 1360 (1979)
 
 
 [1]
 Pub.L. 91-375, 84 Stat. 719 (1970), codified at 39 U.S.C. § 101 et seq. (1976)
 
 
 [2]
 39 U.S.C. § 3623 (1976). The section provides in pertinent part:
 § 3623. Mail classification
 (a) Within 2 years after the effective date of this subchapter, the Postal Service shall request the Postal Rate Commission to make a recommended decision on establishing a mail classification schedule in accordance with the provisions of this section.
 (b) Following the establishment of the mail classification schedule requested under subsection (a) of this section, the Postal Service may from time to time request that the Commission submit, or the Commission may submit to the Governors on its own initiative, a recommended decision on changes in the mail classification schedule.
 (c) The Commission shall make a recommended decision on establishing or changing the schedule in accordance with the policies of this title and the following factors:
 (1) the establishment and maintenance of a fair and equitable classification system for all mail;
 (2) the relative value to the people of the kinds of mail matter entered into the postal system and the desirability and justification for special classifications and services of mail;
 (3) the importance of providing classifications with extremely high degrees of reliability and speed of delivery;
 (4) the importance of providing classifications which do not require an extremely high degree of reliability and speed of delivery;
 (5) the desirability of special classifications from the point of view of both the user and * * * the Postal Service; and
 (6) such other factors as the Commission may deem appropriate.
 
 
 [3]
 The Act provides an exception to this requirement only for cases in which the Postal Rate Commission fails to render a recommended decision in timely fashion. See 39 U.S.C. § 3641 (1976). The Act also permits the Governors to "modify" a recommended decision before implementing it, see 39 U.S.C. § 3625 (1976), but they may do so only in a narrowly circumscribed set of circumstances. See id
 
 
 [4]
 39 U.S.C. § 3603 (1976)
 
 
 [5]
 See Request of the United States Postal Service for a Recommended Decision on Changes in the Classification Schedule re ECOM (September 1978), Joint Appendix (JA) at 85
 
 
 [6]
 Under § 3624, 39 U.S.C. § 3624 (1976), the Commission can issue a recommended decision only after providing hearings pursuant to §§ 556 and 557 of the Administrative Procedure Act, 5 U.S.C. §§ 556-557 (1976). The hearings in this case consumed more than a year
 
 
 [7]
 See 39 U.S.C. § 3623(c)(1) (1976). Section 3624 of the Act, 39 U.S.C. § 3624 (1976), provides that the PRC may not render a recommended decision until after a public hearing, which shall include "an officer of the Commission who shall be required to represent the interests of the general public."
 
 
 [8]
 See Electronic Mail Classification Proposal, 1978, No. MC78-3 (PRC Dec. 17, 1979) (Recommended Decision), JA at 329. Under the Postal Service's original proposal, the Service would have entered a sole-source contract with Western Union. Electronic messages would have been received by the Service only at the site of a Western Union computer in Middletown, Virginia, from which they would have been transmitted to one of 25 serving post offices (SPOs) for printing and delivery. The Commission instead adopted the essential elements of an alternative plan developed by the PRC officer charged under § 3624, 39 U.S.C. § 3624 (1976), with a responsibility to represent the interests of the general public. The Commission's recommended decision called for distribution of data processing equipment among the 25 SPOs, rather than its centralization in the offices of Western Union. It also contemplated free and competitive entry into the telecommunications phase of the service in place of the Western Union monopoly that the Postal Service had sought
 
 
 [9]
 Pursuant to 39 U.S.C. § 3625, the Governors reviewed the recommended decision of the PRC. Although they concurred in "the basic structure of the Commission's Recommended Decision," see Electronic Mail Classification Proposal, 1978, No. MC78-3 (Gov'rs of USPS Feb. 22, 1980) at 1, JA at 714, they purported to find certain ambiguities and inconsistencies in the Commission's recommendations. The Governors therefore rejected the recommended decision that had been submitted, directing the PRC to reconsider three issues, including the designation of the proposed service as experimental. Id. at 3-4, JA at 716-717. Upon reconsideration the Commission essentially reaffirmed its initial decision. Electronic Mail Classification Proposal, 1978, No. MC78-3 (PRC April 8, 1980) (Recommended Decision Upon Reconsideration), JA at 718. The Commission's decision thus came before the Governors a second time. The Governors elected on this occasion to exercise the authority granted them under 39 U.S.C. § 3625(c) (1976) to allow the recommended decision to take effect while at the same time seeking judicial review. Electronic Mail Classification Proposal, 1978, No. MC78-3 (Gov'rs of USPS Aug. 15, 1980), at 1, JA at 773
 
 
 [10]
 See Majority Opinion (Maj.Op.) at 112-116. The majority reads the legislative history as demonstrating "the intention of Congress to vest in the Board of Governors exclusive authority to manage the Postal Service." Id. at 114
 
 
 [11]
 See 39 U.S.C. § 3623 (1976) (quoted in pertinent part at note 2 supra)
 
 
 [12]
 See id
 
 
 [13]
 39 U.S.C. § 3603 (1976)
 
 
 [14]
 See United Parcel Service, Inc. v. United States Postal Service, 604 F.2d 1370, 1381 (3d Cir. 1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980) ("the agency entitled to deference in the interpretation of 39 U.S.C. §§ 3622-24 is the Rate Commission not the Postal Service"); Nat'l Ass'n of Greeting Card Publishers v. United States Postal Service, 569 F.2d 570, 595-596 & n.110 (D.C.Cir.1976), vacated on other grounds, 434 U.S. 884, 98 S.Ct. 253, 54 L.Ed.2d 169 (1977)
 
 
 [15]
 See 39 U.S.C. § 3603 (1976)
 
 
 [16]
 S.Rep.No.91-912, 91st Cong., 2d Sess. 14 (1970)
 
 
 [17]
 Id. at 13
 
 
 [18]
 39 U.S.C. § 3624(a) (1976); see 39 U.S.C. § 3623(c) (1976) (quoted in note 2 supra)
 
 
 [19]
 39 U.S.C. § 3603 (1976)
 
 
 [20]
 39 U.S.C. § 3624 (1976)
 
 
 [21]
 See 39 U.S.C. § 3628 (providing for review under § 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1976))
 
 
 [22]
 See 39 U.S.C. §§ 3623-3625 (1976)
 
 
 [23]
 Under the terms of the House bill, the body equivalent to the Governors would have been able to modify a recommended decision by a majority vote. The bill apparently contemplated that such a modification would be based on a lack of evidence in the record, but, as written, it would also have permitted modifications based on a determination that the recommended decision intruded on the statutory prerogatives of operating management. See H.R. 17070, 91st Cong., 2d Sess. (1970)
 
 
 [24]
 See H.R.Rep.No.91-1363, 91st Cong., 2d Sess. 86 (1970). The statute permits the Governors to modify a recommended decision, but only in cases satisfying the stringent criteria outlined in 39 U.S.C. § 3625(d) (1976). The Governors must first return their request to the PRC for reconsideration. If still dissatisfied with the Commission's recommended decision, the Governors may then consider modification. But they can do so only by "unanimous written concurrence" in cases where they "expressly find that (1) such modification is in accord with the record and the policies of this chapter, and (2) the rates recommended by the Commission are not adequate to provide sufficient total revenues so that total estimated income and appropriations will equal as nearly as practicable estimated total costs." 39 U.S.C. § 3625(d) (1976)
 
 
 [25]
 See Request of the United States Postal Service for a Recommended Decision on Changes in the Classification Schedule re ECOM (September 1978), JA at 85
 
 
 [26]
 See Recommended Decision, supra note 8, at 51-59, JA at 382-390
 
 
 [27]
 See id. at 145-239, 281, JA at 476-570, 612
 
 
 [28]
 See brief for petitioners at 9
 
 
 [29]
 39 U.S.C. § 3603 (1976)
 
 
 [30]
 See Recommended Decision, supra note 8, at 269, JA at 600
 
 
 [31]
 Id. at 269-270, JA at 600-601
 
 
 [32]
 Id. at 270, JA at 601
 
 
 [33]
 Id. at 271, JA at 602
 
 
 [34]
 Brief for respondent at 30-32; see Recommended Decision Upon Reconsideration, supra note 9, at 11-14, JA at 342-345
 
 
 [35]
 Delta Air Lines, Inc. v. CAB, 455 F.2d 1340, 1344 (D.C.Cir.1971), quoting American Airlines, Inc. v. CAB, 359 F.2d 624, 633 (D.C.Cir.1966)
 
 
 [36]
 See Maj.Op. at 116-117. In its Recommended Decision, supra note 8, at 274, JA at 605, the Commission cited two cases involving the Federal Communications Commission, United Telegraph Workers v. FCC, 436 F.2d 920 (D.C.Cir.1970), and American Tel. & Tel. Co., et al. (Dataphone), 50 FCC2d 501 (1974), to support the proposition that experimental initiatives are impliedly within the general authority of agencies involved in setting rates and classifications. In this court the Commission relies more heavily on two cases giving an expansive construction to the "necessary and proper" clause within the jurisdictional grant of the Federal Power Commission, Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153 (D.C.Cir.1967), and Mobil Oil Corp. v. FPC, 483 F.2d 1238 (D.C.Cir.1973). These and other cases hold that "necessary and proper" clauses do not confer independent authority to act, but that they "authorize an agency to use means of regulation not specified in detail, provided the agency's action conforms with the purposes and policies of Congress and does not contravene any terms of the Act." Mobil Oil Corp. v. FPC, supra, 483 F.2d at 1256, quoting New England Power Co. v. FPC, 467 F.2d 425, 430 (D.C.Cir.1972), aff'd, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). In my view, these cases aid the position of the PRC to this extent: they support its claim to authority insofar as the claim is asserted in aid of its statutory responsibilities, is consistent with the purposes and policies of Congress, and does not contravene a specific section of the Postal Reorganization Act. It is on questions concerning fulfillment of these conditions that this case is properly decided
 
 
 [37]
 See 39 U.S. § 3661 (1976)
 
 
 [38]
 455 F.Supp. 857 (E.D.Pa.1978), aff'd, 604 F.2d 1370 (3d Cir. 1979), cert. denied, 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 815 (1980)
 
 
 [39]
 39 U.S.C. §§ 3622-3623 (1976)
 
 
 [40]
 See 455 F.Supp. at 878-879, 604 F.2d at 1380
 
 
 [41]
 39 U.S.C. § 3623(b) (1976)
 
 
 [42]
 See Maj. Op. at 112-116. Essentially without discussion of the intended role of the PRC under § 3623, which it somewhat obliquely characterizes as "authority to assist in * * * classification," id. at 115 (emphasis added), the majority asserts that "a management decision * * * may not be overruled or modified by the Rate Commission." Id. The majority nowhere attempts to identify the criteria by which "management" decisions are identified, or to explain how the PRC's "assistance" function permits it to rewrite some but not other parts of a classification proposal
 
 
 [43]
 455 F.Supp. at 869
 
 
 [44]
 39 U.S.C. § 403(a) (1976)
 
 
 [45]
 39 U.S.C. § 3661(a) (1976)
 
 
 [46]
 United Parcel Service, Inc. v. United States Postal Service, supra note 38, 455 F.Supp. at 870 (emphasis in original)
 
 
 [47]
 39 U.S.C. § 3621 (1976)
 
 
 [48]
 Nat'l Ass'n of Greeting Card Publishers v. United States Postal Service, supra note 14, 569 F.2d at 595-596 n.110
 
 
 [49]
 39 U.S.C. § 3622(a) (1976)
 
 
 [50]
 39 U.S.C. § 3625(f) (1976)
 
 
 [51]
 The section provides in pertinent part:
 (f) The Board shall determine the date on which the new rates, fees, the mail classification schedule, and changes in such schedule under this subchapter shall become effective.
 39 U.S.C. § 3625(f) (1976).
 
 
 [52]
 To say that there is a balance obviously implies that the balance could be upset. And as the Governors argue, it is plain that the Commission could attempt to abuse its authority by needless designation of requested classifications as "experimental"; for if it could force the Governors to come regularly and repeatedly before it, seeking approval of classifications and rates, the PRC could indeed usurp the functions of the Governors by forcing them to meet excessively detailed Commission specifications. The statute, however, expressly provides for judicial correction of any such "abuse of discretion" by the PRC. See 5 U.S.C. § 706 (1976); 39 U.S.C. § 3628 (1976). But no abuse of discretion is presented by the facts of this case, and there is no judicial warrant to establish a per se prohibition limiting the flexibility of response needed for effective Commission action under § 3623, 39 U.S.C. § 3623 (1976). What is more, there is not any reason to think that the majority's per se rule will operate effectively even against the abuses of discretion at which it is presumably aimed. As discussed above, it is settled that the Governors may properly ask the PRC to recommend a temporary or experimental mail classification. But once it is allowed that the Governors may propose experimental designations, the statutory balance no longer depends entirely on the Commission's authority to initiate recommendations that mail classifications should be experimental. To achieve the same effect, the Commission would need only to reject permanent classification proposals submitted by the Postal Service, while at the same time signalling either implicitly or explicitly that an experimental proposal would win its approval. Such action would of course be subject to judicial review as a possible abuse of discretion. But so is a direct Commission recommendation that a proposed classification should be instituted on an experimental basis only
 
 
 [53]
 39 U.S.C. § 3603 (1976)